UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ELIZABETH DeLUCA, and
EDS CARE MANAGEMENT,
INC.,

      Plaintiffs/Counter-Defendants,            Case No. 14-12175

vs.                                         HON. AVERN COHN

AMICA MUTUAL INSURANCE
COMPANY,

      Defendant/Counter-Plaintiff.
_____/


**MEMORANDUM AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT ON DEFENDANT'S COUNTERCLAIM (Doc. 19)**

## TABLE OF CONTENTS

I.      Introduction                                                              1

II.     Background                                                                2

        A.      The Accident                                                      2

        B.      The 2007 Lawsuit                                                  2

        C.      The 2010 Lawsuit                                                  3

        D.      DeLuca Appointed Guardian                                         3

        E.      Basis for EDS's Complaint                                  3

        F.      Proceedings in this Court                                         4

III.    Summary Judgment                                                         4

IV.     An Overview of Michigan's No-Fault Act                                    6

V.      Analysis                                                                  8

        A.      EDS's Arguments                                                   8

        B.      Standing                                                          8

        C.      Real Party in Interest                                            10

        D.      Res Judicata and Collateral Estoppel                             12

                1.      In General                                               12

                2.      The May 2008 Settlement                                  13

                3.      The October 2011 Arbitration                             15


VII.    Conclusion                                                               19

I.  Introduction

This is an insurance case in which plaintiffs seek payment of insurance benefits under Michigan's No-Fault Act from defendant.  The defendant insurance compayne denies liability.  The dispute arises out of an automobile accident on December 26, 2002 in which Stephanie Rudd (Rudd) suffered what was later determined to be a traumatic brain injury.  Plaintiffs/Counter-defendants Elizabeth DeLuca (DeLuca) and EDS Care Management, LLC, (EDS) (collectively, where appropriate, EDS) sued defendant/counter-plaintiff Amica Mutual Insurance Company (Amica) in state court seeking to recover guardianship, conservatory, and trustee expenses, as well as expenses associated with residential and attendant care services supplied to Rudd from May 12, 2013 and beyond.  DeLuca owns EDS, an attendant care provider facility.

Amica removed the case to federal court based on diversity jurisdiction and filed a counterclaim seeking to recoup the funds that it says have been erroneously paid to EDS.  In seeking recoupment, Amica maintains that Rudd did not in fact suffer a traumatic brain injury or that her injuries are not related to the accident.  The counterclaim asserts the following claims:  Payment Under Mistake of Fact (Count I), Unjust Enrichment (Count II), and Breach of Fiduciary Duty (Count III).  In Counts I and II of the counterclaim, Amica seeks a money judgment in the amount of benefits it says it mistakenly paid to EDS on behalf of Rudd.  In Count III, EDS also seeks a money judgment on the grounds that DeLuca engaged in a prohibited transaction under Michigan's Estates and Protected Individuals Code when DeLuca, as guardian for Rudd, removed her from her previous live-in care facility to DeLuca's facility, EDS.

1

Before the Court is EDS's motion for summary judgment on Amica's counterclaims, contending that (1) Amica does not have standing and/or is not the real party in interest to pursue these claims since it has been reimbursed for any payments exceeding $300,000.00 by the Michigan Catastrophic Claims Association, (2) Amica's claims are barred by either res judicata and/or collateral estoppel because of prior litigation between Rudd and Amica.  As will be explained, none of these arguments have merit.   For the reasons that follow, the motion will be denied.

## II.  Background

The material facts as gleaned from the parties' papers follow.

### A.  The Accident

On December 27, 2002, Rudd was riding in an automobile driven by her father when it was involved in an accident.   Rudd injured her head when the airbag deployed and smashed into her face and skull.  Rudd was insured under an automobile policy her father had with Amica.

Sometime after the accident, Rudd was diagnosed by Dr. Owen Z. Perlman to have suffered a traumatic brain injury from the blow to the head by the airbag.  Dr. Perlman also noted that Rudd suffered from an "organic mood disorder with some depression."

Subsequently, Rudd was found to be legally incompetent.  In 2006, Rudd's mother, Robin Massey-Rudd, was appointed her legal guardian.

### B.  The 2007 Lawsuit

In 2007, Rudd's mother sued Amica on behalf of Rudd in state court, seeking PIP benefits.  The case settled in case evaluation proceedings.  Rudd's mother signed,

2

individually and as conservator of Rudd, a Release of Claims for Benefits Under

Michigan's No Fault Law on May 1, 2008.  The case settled for $200,000 for claims

made through April 18, 2008; a Stipulation and Order for Dismissal was entered

thereafter.

### C.  The 2010 Lawsuit

A few years later, Rudd's mother filed a second lawsuit in state court against

Amica for benefits that expenses that occurred after April 18, 2008.  The parties agreed

to submit the claim to binding arbitration.  The agreement between the parties stated

that

> [t]he arbitrators shall hear and determine the issues of liability and allowable
> damages under MCL 500.3105. The arbitrators … will decide:  What allowable
> expenses, if any, are owed by Amica, after April 18, 2008, as a result of the
> December 27, 2002 motor vehicle accident?

The arbitrators awarded Rudd $178,593.96.  The award covered the period from

April 18, 2008 to the date of the award, October 26, 2011 and was broken down among

specific medical providers.

### D.  DeLuca Appointed Guardian

In 2012, the Washtenaw County Probate Court appointed DeLuca as Rudd's new

legal guardian.  Deluca is a licensed attorney and owner of EDS, an attendant care

provider company.  DeLuca, with Rudd's mother's agreement, transferred Rudd from

her prior live-in care facility, Eisenhower Center, to EDS's facility sometime after May of

2013.

### E.  Basis for EDS's Complaint

EDS says that it has incurred reasonable and necessary expenses in caring for

3

Rudd as well assisting her in her recover and rehabilitation from the injury she suffered

in the accident.  EDS sought payment for these expenses from Amica.  After

questioning whether there was a conflict of interest with DeLuca being Rudd's personal

representative and her company providing care for Rudd, Amica agreed to pay EDS's

claims at a rate negotiated by DeLuca and a claims representative for Amica.

At some point thereafter, Amica stopped paying on EDS's claims.  DeLuca and

EDS then sued Amica.

## F.  Proceedings in this Court

Following a status conference, the Court issued an order stating in pertinent part:

> The complaint is this case claims first party benefits not paid under no fault. Defendant has filed a counterclaim for overpayment.
> The claim and counterclaim are BIFURCATED, and shall move forward on the docket separately.  Papers to be filed shall be noted as CLAIM or COUNTERCLAIM.
> Pending on the COUNTERCLAIM is a motion for summary judgment. After   disposition of the motion, a scheduling order will issue, if appropriate.

(Doc. 22).

## III.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by

'showing' – that is, pointing out to the district court -- that there is an absence of

evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S.

317, 325 (1986).  Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, id. at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," Hager v. Pike County Bd. Of Education, 286 F.3d 366, 370 (6th Cir. 2002).

5

IV.  An Overview of Michigan's No-Fault Act

Amica's counterclaim is based on Michigan's No-Fault Insurance Act, M.C.L. § 500.3101 et seq. (the No-Fault Act).  The No-Fault Act requires that all owners of motor vehicles in Michigan carry insurance, and that the insurance company is "liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle."  M.C.L. § 500.3105.  These type of benefits are known as "personal protection insurance benefits" or PIP benefits.  PIP benefits are usually paid by the victim's insurance company as stated under Michigan law, and are always paid no matter who was at fault in the accident.  The No Fault Act also provides:

> A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, may charge a reasonable amount for the products, services and accommodations rendered.

M.C.L. § 500.3157.

A person seeking a PIP benefit for a particular expense bears the burden of proving that (1) the no-fault benefits/services claimed are reasonably necessary; (2) the charge for the service is reasonable; and (3) the service was incurred.  Owens v. Auto Club Ins. Ass'n, 444 Mich. 314, 323-324 (1993); Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 50 (1990); Shanafelt v. Allstate Ins. Co., 217 Mich. App. 625, 637 (1996); Davis v. Citizens Ins. Co. of America, 195 Mich. App. 323, 326-327 (1993); Moghis v. Citizens Ins Co of America, 187 Mich. App. 245, 247 (1991).

6

Specifically, the No-Fault Act covers expenses that are described in the act as "all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recover or rehabilitation."  M.C.L. § 500.3107(1)(a).  The burden of proof as to these items lies with the claimant. <u>Nasser</u>, 436 Mich. at 49-50.  The claimant further bears the burden of providing reasonable proof regarding its claimed entitlement to the benefits sought. See, e.g., M.C.L. § 500.3142; M.Civ.J.I. 35.04.

To the extent claimed expenses fall under M.C.L. § 500.3105 and M.C.L. § 500.3107(1)(a), the No-Fault Act "requires insurers to pay or reimburse their insured's lifetime medical expenses—'[t]here is no dollar limit on the insurer's liability for medical, hospital, and rehabilitation benefits under the statute.'"  <u>Farmers Ins. Exchg. v. Titan Ins. Co.</u>, 251 Mich. App. 454, 456 (2002), quoting <u>League Gen. Ins. Co. v. Michigan Catastrophic Claims Ass'n</u>, 435 Mich. 338, 340 (1990).  Therefore, [t]o alleviate some of the effect that large claims arising from severe injuries may have on insurance companies, [the] Legislature created the MCCA [Michigan Catastrophic Claims Association ("MCCA")]."  <u>Farmers Ins. Exchg.</u>, 251 Mich. App. at 456-457.  Specifically, M.C.L. § 500.3104(1) directs:

> An unincorporated, nonprofit association to be known as the catastrophic claims association, hereinafter referred to as the association, is created. Each insurer engaged in writing insurance coverages that provide the security required by section 3101(1) [MCL 500.3101(1)] within this state, as a condition of its authority to transact insurance in this state, shall be a member of the association and shall be bound by the plan of operation of the association….

Depending upon the year in which the policy was written or renewed, the MCCA

supplies some level of reimbursement to no-fault insurers. M.C.L. 500.3104(2) provides:

> The association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence:
> * * *
> (b) For a motor vehicle accident policy issued or renewed during the period July 1, 2002 to June 30, 2003, $300,000.00.

In order to protect no-fault insurers, such as Amica, from losses, the Michigan Legislature created the Michigan Catastrophic Claims Association (MCCA). No-fault insurers, such as Amica, are required to be a part of the MCCA. M.C.L. §500.3104(1).

In accordance with the statute, MCCA reimbursed Amica for all payments made to EDS for the services that were provided to Rudd.

## V.  Analysis

### A.  EDS's Arguments

EDS says that summary judgment is appropriate because Amica lacks standing and is not a real party of interest to pursue its counterclaims because it has been fully reimbursed for payments made by MCCA. EDS also says that Amica is barred from asserting a counterclaim under the doctrines of res judicata and collateral estoppel based on the litigation history of the parties.

Each argument is addressed in turn below.

### B.  Standing

EDS says that Amica lacks standing. In order for a party to have standing, there must have been an injury in fact suffered, that injury must have been caused by the

8

defendant, and there must be redress available for that injury.  <u>Am. Civil Liberties Union of Ohio, Inc. v. Taft</u>, 385 F.3d 641, 645 (6th Cir. 2004).  EDS says that Amica has not suffered an injury in fact because it was fully reimbursed for the payments it made to EDS.

This argument is not well-taken.  Notably, EDS cites no case law in support of its position nor does research reveal any case law.  Further, Amica did suffer an injury - having to pay for PIP benefits that it says were improper.  The fact that MCCA reimbursed Amica does not change the matter.

In <u>Farmers Ins. Exchg. v. Titan Ins. Co.</u>, 251 Mich. App. 454 (2002), the Michigan Court of Appeals addressed the impact of MCCA reimbursement.  Farmers paid its insured no-fault benefits as a result of an automobile accident.  Farmers then discovered that Titan Insurance Company was in equal order of priority.  Farmers then sued Titan, seeking one half of what was paid in connection with the claim.  <u>Id</u>. at 455. The trial court found that Titan was required to pay for half of the current claim.  <u>Id</u>. Titan appealed, arguing they should not have to pay Farmers because Farmers had already been repaid by MCCA.  The Michigan Court of Appeals disagreed.  <u>Id</u>. at 459. The Court of Appeals stated that "when an insurer pays out benefits, it can recoup part of the money paid from another insurer in equal priority, even if the MCCA already has reimbursed the initial insurer."  <u>Id</u>.  The Court of Appeals also stated that "it is clearly the initial insurer's duty to surrender to the MCCA any money it recovered that represented funds for which the MCCA already had reimbursed it, less any amount the board permits it to retain for costs and fees incurred in obtaining the recovery."  <u>Id</u>.

9

Although <u>Farmers</u> was a dispute between two insurers, and did not address standing, it is persuasive to dispose of EDS's standing argument.  In other words, that fact that Amica was reimbursed from MCCA does not impair its ability to seek monies it paid.  Any monies Amica obtains must be turned over to MCCA.[1]

### C.  Real Party of Interest

EDS relatedly argues that Amica is not the real party of interest  because once MCCA reimbursed Amica for payments it made, MCCA assumed Amica's liability.  This argument has no merit.

To be a real party of interest "a plaintiff must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'… [the] claim must be more than a "generalized grievance"… [and] the plaintiff's claim must fall within the 'zone of interests.'"  <u>Coyne v. Am. Tobacco Co.</u>, 183 F.3d 488, 494 (6th Cir. 1999).

Under M.C.L. § 500.3104(2), "[t]he association [MCCA] shall provide and each member all accept indemnification for 100% of the amount of the ultimate loss sustained

---

[1]The Plan of Operation has not changed since <u>Farmers</u> and still provides: Whenever a Member recovers from a third party an amount for which it has already been reimbursed by the Association, the Member shall promptly turn such recovered monies over to the Association to the extent of any reimbursement theretofore received, provided that the Board may permit a Member to retain therefrom such amount as the Board deems reasonable and necessary attorney fees and litigation costs incurred in connection with obtaining the recovery from the third party.
Michigan Catastrophic Claims Association Plan of Operation, Article X, § 10.06, Exhibit 9.

under personal protection coverages in excess of the following amounts."  Those

"following amounts" are according to specific statutes that provide various threshold

amounts depending on the time period of the policy.  Additionally the Supreme Court of

Michigan has said that "Black's Law Dictionary (5th ed.) defines 'indemnify' as '[t]o

restore the victim of a loss, in whole or in part, by payment…; to secure against loss or

damage…' Indemnification is not…like an insurance plan. Instead, it is a set security

meant to assist against certain circumstances." U.S. Fidelity Ins. & Guar. Co. v. MCCA,

795 N.W.2d 101, 110 (Mich. 2009).

Again, Farmers disposes of EDS's argument.  Relying upon Michigan's real party

in interest statute, M.C.L. 600.2041, and other authority, the Court of Appeals

determined that Farmers appropriately pursued recoupment from Titan even though

Farmers had been paid by the MCCA.  The Court of Appeals explained:

> However, the Legislature directed that a plan be developed that covers
> specific topics and provides for "[a]ny other matter required by or necessary to
> effectively implement this section [MCL 500.3104]." M.C.L. § 500.3104(10)(h).
> Because both Titan and Farmers are "bound by" and must "subscribe to and
> participate in the plan," M.C.L. § 500.3104(20), we believe that reliance on the
> language of the plan is appropriate in this situation.
>
> Whenever a member recovers from a third-party an amount for which it
> has already been reimbursed by the Association, the member shall promptly turn
> such recovered monies over to the Association to the extent of any
> reimbursement theretofore received, provided that the Board may permit a
> member to retain therefrom such amount as the Board deems reasonable and
> necessary attorney fees and litigation costs incurred in connection with obtaining
> the recovery from the third party. [Michigan Catastrophic Claims Association Plan
> of Operation, Article X, § 10.06.]
>
> The plan demonstrates that despite the lack of explicit direction from the
> Legislature with regard to the circumstances in the present case, the MCCA
> board anticipated such circumstances occurring and provided an answer. Under
> these circumstances, we believe that the MCCA plan of operation should be read
> in combination with the Legislature's intent of a pro-rata distribution of expenses

11

for insurers in equal priority. MCL 500.3115(2).  Accordingly, when an insurer pays out benefits, it can recoup part of the money paid from another insurer in equal priority, even if the MCCA already has reimbursed the initial insurer. Under the plan, it is clearly the initial insurer's duty to surrender to the MCCA any money it recovered that represented funds for which the MCCA already had reimbursed it, less any amount the board permits it to retain for costs and fees incurred in obtaining the recovery.  Accordingly, the trial court made no error in allowing Farmers to recover from Titan.

Id. at 458-459. (Emphasis added).  See also, State Farm Mut. Automobile Ins. Co. v. Michigan Municipal Risk Mgmt. Authority, Inc., 2013 WL 306844, *1, 12-13 (Mich. Ct App. Aug 13, 2013)(unpublished) (rejecting defendant's argument that, as the real party in interest, the MCCA is the only entity that can seek to recover amounts in excess of $375,000).

Here, as in Farmers, Amica is looking to be recoup monies paid to EDS for Rudd's care.  Amica is, therefore, a party in interest.

### D.  Res Judicata and Collateral Estoppel

#### 1.  In General

Finally, EDS says that Amica is barred by res judicata and/or collateral estoppel from seeking to recoup PIP benefits already paid because the issue was already litigated in two prior state court actions.

A federal court must look to state law when it is deciding if a matter is barred by prior action that took place in state court.  Spence v. TRW Inc., 92 F.3d 380, 382 (6th Cir. 1996).  In Michigan, res judicata will bar a subsequent case if the prior case was decided on the merits and the matter in the second case was, or could have been, decided in the prior case.  Bd. of County Rd. Comm'rs v. Schultz, 205 Mich. App. 371

12

(Mich. Ct. App. 1991).  Additionally both actions have to involve the same parties.  Id.

As to "[c]ollateral estoppel, or issue preclusion, precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding."  Ditmore v. Michalik, 244 Mich. App. 569, 577 (2001); People v. Gates, 434 Mich. 145, 154 n.7 (1990) (the doctrine of res judicata operates to give preclusive effect to a judgment by precluding the relitigation of a claim, while the doctrine of collateral estoppel operates to preclude the relitigation of issues).

As explained below, neither res judicata nor collateral estoppel applies to bar Amica's counterclaim.

### 2.  The May 2008 Settlement

EDS says that based on Amica's settlement payment in May 2008, Amica's liability is conclusively established and Amica cannot now seek recoupment.  Not so. Courts have held that the fact that an insurer has made some payment to or on behalf of an insured does not establish liability for an injury and does not preclude an insurer from later asserting that it owes nothing.  See Hammermeister v. Riverside Ins. Co., 116 Mich. App. 552, 556-57 (1982); accord, Golumbia v. Prudential Ins Co, 116 F.3d 1480, *3 (6th Cir. 1997) (finding that "…payment of insurance benefits for a specified period of time does not prevent an insurance company from later asserting that it owes no duty to

13

pay those benefits.").[2]

The Michigan Court of Appeals in <u>Hammermeister</u> explicitly addressed a prior

payment of no-fault benefits, wage-loss benefits, not PIP benefits:

> The mere fact that the insurer paid some wage-loss benefits is insufficient by
> itself for us to hold that, in the event the insured filed suit objecting to the amount
> of benefits paid, the insurer is precluded from asserting that it owes the insured
> nothing at all. An insurer might rationally conclude it is better to pay something on
> a suspect claim than to litigate the matter in the hope of paying nothing at all yet
> to take the position that it has no liability to the insured, where the insured files
> suit.

116 Mich. App. at 556-557.

Under <u>Hammermeister</u>, the fact that an insurer has paid some no-fault benefits

does not preclude that insurer from later arguing that no benefits are due.  In <u>Calhoun v</u>

<u>Auto Club Ins Ass'n</u>, 177 Mich App 85, 89 (1989), abrogated on other grounds

<u>Tousignant v Allstate Ins Co.</u>, 440 Mich 301 (1993), the Michigan Court of Appeals

followed <u>Hammermeister</u> and noted that it may be perfectly rational for an insurer to pay

benefits on a suspect claim rather than undertake the expensive task of litigation.  The

Court of Appeals explained that an insurer – even if it made previous payments – "is not

estopped from arguing that it is not obligated to pay plaintiff medical benefits under its

contract of no-fault insurance."  <u>Calhoun</u>, 177 Mich. App. at 89.

Here, EDS is incorrect in arguing that Amica is somehow "locked in" to pay

no-fault benefits simply because it paid some no-fault insurance benefits in the past as

---

[2]The Federal Rules of Evidence expressly provide that "[e]vidence of furnishing,
promising, or offering to pay medical, hospital, or similar expenses resulting from an
injury is not admissible to prove liability for the injury.  Fed. R. Evid. 409.

part of a settlement.  Indeed, the Release executed by Rudd's mother on behalf of Rudd

directs that it, "…shall not be construed to apply to any claim that I may have for

personal protection No-Fault benefits which may become due and payable at some time

after April 18, 2008 under MCL 500.3107."  Additionally, the Release states:

> It is understood and agreed that this settlement is the compromise of a doubtful
> and disputed claim, and that the payment made is not to be construed as an
> admission of liability on the part of the party or parties hereby released, and that
> said releases [sic] deny liability therefor and intend merely to avoid litigation and
> buy their peace.

Thus, at most the May 2008 settlement between Amica and Rudd resolved Rudd's right

to PIP benefits up until April 2008.  Under Hammermeister and Calhoun, Amica is not

precluded by res judicata or collaterally estopped from challenging Rudd's entitlement to

PIP benefits after that date.

### 3.  The October 2011 Arbitration

EDS's argument that Amica cannot seek recoupment because of the October

2011 arbitration is also flawed.  The arbitration between Rudd and Amica involved only

"no-fault benefits incurred through and including OCTOBER 26, 2011 arising from the

motor vehicle accident on DECEMBER 27, 2002."  See Exhibit J to Amica's response,

Arbitration Award.  The award also says is has "no[] affect [on] any claim for first party

no-fault benefits after OCTOBER 26, 2011." Id.

Here, EDS's claims did not arise until May of 2013 at the earliest, when it took

over Rudd's care.  The arbitration dealt with expenses before and up to October 26,

2011.  This action, between different parties, involves expenses incurred well after the

arbitration.

In Elser v. Auto-Owners Ins. Co., 253 Mich. App. 64, 67-69 (2002), the Michigan Court of Appeals addressed a similar argument.  Elser involved a scenario where the defendant sought to use a judgment rendered in the first no-fault action to bar a second action arising out of the same accident, which involved claims for future benefits and which had not been incurred at the time the judgment in the first case was issued.  The Court of Appeals rejected a similar res judicata argument, explaining:

> In the present case, the February 1996 verdict covered only expenses incurred up until the date of trial, and did not contain any declaration or determination regarding future expenses. There is no indication in the record that either party sought a declaratory judgment regarding future expenses. Because the issue of future expenses was not litigated and decided in the prior lawsuit, we reject defendant's argument that res judicata bars plaintiff's claims for additional expenses incurred after the February 1996 verdict.

Id. at 68-69.

As in Elser, the prior arbitration between Rudd and Amica involved only "no-fault benefits incurred through and including OCTOBER 26, 2011 arising from the motor vehicle accident on DECEMBER 27, 2002."  Res judicata simply does not bar Amica from bringing a counterclaim to recoup benefits after October 2011.  EDS's argument that the arbitration award conclusively establishes that Rudd is injured and entitled to benefits reads too much into the arbitration award.

As to collateral estoppel, in Warren v. State Farm Mut. Automobile Ins. Co., 2007 WL 1267579 (E.D. Mich. 2007), the district court concluded that preclusion doctrines apply to only the insurance benefits in dispute in the first litigation.

16

> In no-fault cases, Courts have specifically addressed that there is a continuing accrual of no-fault benefits, based on the core language of the No-Fault Act. A dismissal with prejudice only affects the benefits at issue prior to that dismissal. A final judgment on the merits does not bar a Plaintiff's claim for continuing benefits that are unpaid.

See also Villaflor v. State Farm Mut. Automobile Ins. Co., Case No. 07-cv-13939 (E.D. Mich. Dec. 10, 2008) (attached as Exhibit 11 to Amica's response).

Here, the 2011 arbitration panel did not make a finding that Rudd sustained a traumatic brain injury or that any particular injury resulted from the accident.  The specific findings that EDS believes should be given collateral estoppel effect –regarding Rudd's injury– simply cannot be deduced from the arbitration award.

Decisions from the Michigan Court of Appeals have reached the same conclusion.  In Collier v Liberty Mutual Ins. Co, 2011 WL 668370 (Mich. Ct. App. Feb. 24, 2011) (unpublished), the court of appeals reversed the trial court's grant of summary disposition on the basis of a prior arbitration award.  In Collier, the plaintiff argued that collateral estoppel precludes relitigation of the question of whether plaintiff's injuries were related to the motor vehicle accident because the issue was decided by the arbitration panel in a valid final judgment of the arbitration panel.  Id. at *1.

The court of appeals recognized that, with regard to arbitration proceedings, collateral estoppel applies to factual determinations made by the arbitrators.  Id. at *2, citing Porter v. Royal Oak, 214 Mich. App. 478, 485 (1995).  However, the court of appeals concluded that:

> …the arbitration award contains no factual determinations. Accordingly, there is no "valid and final judgment" on an essential question of fact. Moreover, the

17

> award is specifically limited to plaintiff's entitlement to benefits up to December 22, 2004. Thus, there is no showing that the arbitration panel resolved the question of whether there is a causal connection between the automobile accident and any expenses at issue after the panel rendered its decision.

Id. at *3. The court of appeals noted that "[t]he doctrine of collateral estoppel applies only when the ultimate issue to be determined in the subsequent action is 'identical, and not merely similar' to the issue involved in the previous action." Id.

EDS cites Siporin v Auto Club Ins. Ass'n, 2007 WL 431081 (Mich. Ct. App. Feb. 8, 2007)(unpublished). In Siporin, an arbitration panel determined that a bill submitted by Broe Rehabilitation was for treatment/attendant care unrelated to the motor vehicle accident of May 10, 1998. Id. at *1. In a subsequent action, the plaintiff submitted expenses for treatment and attendant care provided by Broe Rehabilitation. Defendant moved for summary disposition, arguing that the issue of the causal relationship between those services and the accident was previously determined in the arbitration award. The Michigan Court of Appeals disagreed, finding that "defendant's motion did not establish that collateral estoppel applied." Id. at *2. The Court of Appeals explained:

> The arbitrators decided the issue of the causal connection between the 1998 accident and the services provided by Broe Rehabilitation up to the date of the arbitration proceeding; they did not resolve the causal connection between the accident and services rendered after the arbitration. For collateral estoppel to apply, the ultimate issue to be determined in the subsequent action "must be identical, and not merely similar, to that involved in the first action." Defendant did not present any evidence concerning the Bore Rehabilitation services that were evaluated by the arbitration panel or the services provided after the arbitration to establish that the causal connection between the post-arbitration services and the accident was actually litigated and decided by the arbitrators. Thus, defendant failed to show that it was entitled to judgment as a matter of law.

Id. at *2 (citations omitted) (emphasis added)

Here, as in <u>Siporin</u>, the ultimate issue in this action must be identical, and not merely similar, to that involved in the first action. EDS has not shown as a matter of law that there is a causal connection with the arbitration award and Amica's counterclaim to recoup benefits it paid to EDS for Rudd's care after the arbitration award.

Finally, the conclusion that Amica is not barred from pursuing its counterclaim is consistent with the general recognition that, under Michigan's No-Fault Act, future benefits remain unaffected by earlier events. <u>See, e.g.</u>, MCL 500.3143, which provides, "[a]n agreement for assignment of a right to benefits payable in the future is void."

VI. Conclusion

For the reasons stated above, EDS's motion is DENIED.

SO ORDERED.

        S/Avern Cohn
        AVERN COHN
        UNITED STATES DISTRICT JUDGE

Dated: August 10, 2015

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 10, 2015, by electronic and/or ordinary mail.

        S/Marie Verlinde for s/Sakne Chami
        Case Manager, (313) 234-5160

19