UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH DeLUCA, and
EDS CARE MANAGEMENT,
INC.,

    Plaintiffs/Counter-Defendants,

vs.

AMICA MUTUAL INSURANCE
COMPANY,

    Defendant/Counter-Plaintiff.
_____/

Case No. 14-12175

HON. AVERN COHN

**<u>MEMORANDUM AND ORDER</u>**
**<u>GRANTING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT (Doc. 67)</u>**
**<u>AND</u>**
**<u>DISMISSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 52) AS MOOT</u>**

I.  Introduction

This is an insurance dispute.  Plaintiffs/Counter-defendants, Elizabeth DeLuca (DeLuca) and EDS Care Management, LLC (EDS) (collectively, where appropriate, EDS) sued defendant/counter-plaintiff Amica Mutual Insurance Company (Amica) seeking payment of personal insurance protection (PIP) benefits under Michigan's No-Fault Act from defendant.  The PIP benefits are for the care of Stephanie Rudd (Rudd), the insured.  Amica filed a counterclaim seeking recoupment of benefits.

Before the Court is Amica's motion to dismiss EDS's First Amended Complaint (Doc. 67) on the grounds that the September 2017 assignments of Rudd's rights to EDS and DeLuca are invalid.  For the reasons that follow, the motion will be granted.  As will be explained, the assignments are valid; however, recovery is limited to recovering PIP

benefits from one year back from the date of the assignment, or September 2016. Because EDS is seeking benefits incurred prior to that time, the complaint must be dismissed for failure to state a claim. In light of the dismissal, Amica's pending summary judgment motion (Doc. 52) is moot.

## II. Background

### A. Factual Background

This dispute arose from an automobile accident that occurred on December 26, 2002 in which 14 year old Rudd suffered what was later to be determined a traumatic brain injury. At the date of the accident, Rudd was insured under an automobile policy held with Amica, through her father.

In 2007, Rudd's mother sued Amica on behalf of Rudd in state court, seeking PIP benefits through April 18, 2008. The case settled for $200,000; a Stipulation and Order for Dismissal was entered. In 2010, Rudd's mother filed a second case against Amica for PIP benefits incurred after April 18, 2008. The parties went to arbitration on this claim; Rudd was awarded $178,593.96. This award covered the period April 18, 2008 through October 26, 2011.

In 2012, DeLuca was appointed Rudd's legal guardian. DeLuca owns EDS, the facility that provided care for Rudd. EDS says that it has incurred reasonable expenses in caring for Rudd during her recovery from the accident and seeks payment from Amica for these expenses. Amica has negotiated payment with EDS in the amount of $268,555.50 for the period of August 19, 2012 through July 31, 2013, and $41,815.88 with DeLuca for the period of February 15, 2012 through October 31, 2013. At some point, Amica stopped paying.

2

B. Procedural History

DeLuca and EDS sued Amica in state court seeking to recover guardianship, conservatory, and trustee expenses, as well as expenses associated with residential and attendant care services supplied to Rudd.

Amica removed the case to federal court based on diversity jurisdiction and filed a counterclaim seeking to recoup the funds that it claims have been erroneously paid to EDS. In seeking this recoupment, Amica says that Rudd did not in fact suffer a traumatic brain injury or that her injuries are not related to the accident. Amica's counterclaim asserts the following claims: mistake of fact (Count I); unjust enrichment (Count II) against EDS; and breach of fiduciary duty (Count III) against both DeLuca and EDS.

EDS filed a motion for summary judgment on Amica's counterclaims, contending that (1) Amica does not have standing and/or is not the real party in interest to pursue these claims since it has been reimbursed for any payments exceeding $300,000 by the Michigan Catastrophic Claims Association, and (2) Amica's claims are barred by res judicata of prior litigation between Rudd and Amica. The Court has denied EDS's motion for summary judgment on Amica's counterclaims. (Doc. 31).

Since then, the parties have engaged in discovery which has been contentious. During discovery, Amica says it became aware that EDS is not a licensed care facility. Amica said that this information provided it with a plausible defense to non-payment. Amica moved to amend its answer to add this as an affirmative defense and amend its counterclaim based on EDS not being a licensed adult foster care facility. (Doc. 43). The Court granted the motion. (Doc. 47).

3

Thereafter, Amica filed a motion for summary judgment based on its amended answer and counterclaim, i.e. that EDS is not a licensed "adult foster care facility" as required under the Adult Foster Care Facility Licensing Act, M.C.L. § 400.701 and is therefore not entitled to payment of PIP benefits for the "adult foster case services" it provided. (Doc. 52).

Amica has also filed a motion to dismiss on the grounds that EDS, as a service provider, is not entitled to seek benefits on behalf of Rudd. (Doc. 55) The motion was essentially based on the Michigan Supreme Court's decision in <u>Covenant Med. Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 500 Mich. 191 (2017) which held that medical service providers, such as EDS, have no statutory cause of action to collect PIP benefits directly from no-fault insurers, such as Amica, under the No-Fault Act. <u>Id</u>.

After the summary judgment and motion to dismiss were filed, the parties stipulated to entry of an order allowing EDS to amend the complaint to include an assignment of rights count. (Doc. 64).

Following the stipulation, the Court entered an order mooting Amica's motion to dismiss and holding its summary judgment motion in abeyance. The Court explained:

> Under <u>Covenant</u>, EDS may seek reimbursement of benefits directly from Amica if it has a valid assignment from the insured. EDS shall file its assignment of rights claim within fifteen (15) days. Amica may file a motion to dismiss the assignment of rights claim within thirty (30) days thereafter.
> If the Court determines that EDS has a valid assignment, it will then address Amica's motion for summary judgment.

(Doc. 65 at p. 4).

EDS then filed a First Amended Complaint, contending that it has a right to collect PIP benefits from Amica based on an assignment executed by Rudd's guardian.

4

(Doc. 66).

As contemplated in the order, Amica has moved to dismiss the First Amended Complaint on the grounds that EDS did not get a valid assignment from Rudd and, if the assignment is deemed valid, EDS can only recover PIP benefits from one year back from the date of the assignment.

### C. Facts Relevant to the Assignment

On September 18, 2017, Rudd's new legal guardian, ARC Services of Macomb, Inc., executed two documents entitled "Assignment of Rights" which are intended to transfer any claim Rudd has to recover PIP benefits to EDS and DeLuca as a server provider. EDS has amended its complaint to allege that these assignments permit it to seek PIP benefits from Amica for services it has provided to Rudd. The assignments are attached to the First Amended Complaint. Except for the identification of the designated assignees, (one for EDS and one for Deluca), the documents are identical. The operative language reads:

> This is an assignment of right to enforce payment of charges incurred for Services, for which charges are payable under any policy of insurance, contract, legal claim and/or statute. Such assignment shall include, in Assignee's sole discretion, the right to appeal a payment denial under any procedure outlined in any insurance policy, contract or statute and/or the right to file suit to enforce the payment of benefits due or past due for the Services incurred and resulting charges.

While Rudd is noted as the Assignor, each document is executed by Mary Scarsella, acting on behalf of Arc Services of Macomb, as Guardian for Rudd. Along with the assignments, EDS attached a "Letter of Successor Full Guardianship" issued by the Macomb Probate Court. The letter, issued October 27, 2016, appoints Arc Services of

5

Macomb Inc as successor legal guardian of Rudd.

### III. Legal Standard

A Rule 12(b)(6) motion seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "The court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001). To survive a motion to dismiss under Rule 12(b)(6), a "'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 319 (6th Cir. 1999) (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)). "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 500 U.S. 544, ___; 127 S. Ct. 1955, 1974 (2007). "[E]ven though a complaint need not contain 'detailed' factual allegations, its factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Assn. of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007), citing Twombly (internal citations and quotation marks omitted).

### IV. Discussion

#### A. Assignments in General

An assignment is a conveyance of rights from one person to another. See Weston v. Dowty, 163 Mich. App. 238, 242 (1987) ("[a] transfer or making over to

6

another of the whole of any property, real or personal, in possession or in action, or of any estate or right therein") quoting Black's Law Dictionary (4th ed), p. 153. An assignment is a form of contract and is governed by general contract law principles. Burkhardt v. Bailey, 260 Mich. App. 636, 653, 680 (2004), citing Calamari & Perillo, Contracts (3d ed), § 18–10, p. 735. "To constitute a valid assignment there must be a perfected transaction between the parties which is intended to vest in the assignee a present right in the thing assigned." Weston, 163 Mich. App. 238.

In Michigan, assignment contracts are subject to the statute of frauds. M.C.L. § 566.132 provides:

> In the following cases an agreement, contract, or promise is void unless that agreement, contract, or promise, or note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise:
> (f) An assignment of things in action, whether intended as a transfer for sale, for security, or otherwise.

Like other contracts, "in determining whether an assignment has been made, the question is one of intent." Burkhardt, 260 Mich. App. at 636. "No particular form of words is required for an assignment, but the assignor must manifest an intent to transfer and must not retain any control or any power of revocation. Id. at 636, citing Travertine Corp. v. Lexington-Silverwood, 670 N.W.2d 444, 447 (Minn. Ct. App. 2003).

B. Parties' Arguments

Amica says that the assignments are invalid because Rudd's guardian lacked the capacity to transfer her rights because (1) Rudd is an incapacitated person and (2) a guardian, unlike a conservator, cannot transfer rights. Amica also says that assuming the assignment are valid, they are effective only to convey claims for services incurred

7

more than one year prior to the time they were executed.

EDS says the assignments are valid because a guardian can execute an assignment and the assignments relate back to the original filing date of the complaint.

## C. Validity of the Assignments

It is well settled that a person is incapable in law of contracting when that person is mentally incompetent. See Rodenhiser v. Duenas, 296 Mich. App. 268, 273 (2012); In re Erickson Estate, 202 Mich. App. 329, 332 (1993). Rudd is an incapacitated person. Rudd's guardian executed the assignments. The question is whether the guardian had the authority to do so.

M.C.L. § 700.5306 governs the appointment of a guardian for an incapacitated person. To appoint a guardian, a court must find that a person is incapacitated and "that the appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual...." M.C.L. § 700.5306(1). Moreover, the guardian must "make provision for the ward's care, comfort, and maintenance" and must "secure services to restore the ward to the best possible state of mental and physical well-being so that the ward can return to self-management at the earliest possible time." M.C.L. § 700.5314(b). Importantly, if the guardian's ward does not have a conservator, the guardian may institute support proceedings and "[r]eceive money and tangible property ... for the ward's support, care, and education." M.C.L. § 700.5314(d). If the ward has a conservator, the guardian must "pay to the conservator, for management as provided in this act, the amount of the ward's estate received by the guardian in excess of the amount the guardian expends for the ward's current support, care, and education" and must "account to the conservator for the amount expended."

M.C.L. § 700.5314(f).

A probate court may appoint a conservator if the court determines that the "individual is unable to manage property and business affairs effectively," in relevant part because of "mental illness, mental deficiency, physical illness or disability," M.C.L. § 700.5401(3)(a), and that the individual has "property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money." M.C.L. § 700.5401(3)(b). A probate court may also "appoint a conservator" for "an individual who is mentally competent, but due to age or physical infirmity is unable to manage his or her property and affairs effectively and who, recognizing this disability, requests a conservator's appointment." M.C.L. § 700.5401(4).

Here, Amica argues that only a conservator, not a guardian, has the right to collect Rudd's benefits. In other words, Rudd should have had a conservator appointed, not a guardian, because a guardian can only oversee Rudd's "comfort, care and maintenance" whereas a conservator can manage Rudd's business or financial affairs. Amica cites no law which holds that only a conservator, not a guardian, can assign a ward's right to receive PIP benefits. Indeed, in <u>Professional Rehabilitation Associates v. State Farm</u>, 228 Mich. App. 167 (1998), the plaintiff service provider sued for benefits it paid to the insured. The insured was incapacitated so his wife was appointed guardian. As guardian, the wife assigned the insured's right to PIP benefits to plaintiff. While the court of appeals did not address whether a guardian had a right to assign an insured's PIP benefits, the case is an example of a <u>guardian</u> assigning an

insured's right to PIP benefits to a provider, as was done here.  Moreover, the court of appeals did address the issue of whether PIP benefits could be assigned at all, concluding that past due benefits could be assigned and that the assignment operated as such.  Moreover, PIP benefits are intended to provide the "comfort, care, and maintenance" for which the guardian is responsible.  In sum, there is no requirement that Rudd had to have a conservator, not a guardian, assign her right to PIP benefits to EDS.

Amica also argues that Rudd, as an incapacitated person, lacked the ability to waive her rights.  In support, Amica relies on a case involving whether a parent can waive rights on behalf of his or her minor child.  Specifically, in <u>Woodman ex rel. Woodman v. Kera LLC</u>, 486 Mich. 228, 236 (2010), five-year-old Trent Woodman broke his leg at a birthday party held in an indoor playground.  Prior to the party, Trent's father signed a document in which he acknowledged the risk associated with the activity and stated that "in consideration for the undersigned waiving his/her claim against BOUNCE PARTY, and their agents, the undersigned will be allowed to participate in any of the physical activities."  Trent's father signed as Trent's parent/legal guardian.  The trial court dismissed Trent's negligence claim.  The court of appeals reversed and held that "a parent has no authority merely by virtue of the parental relation to waive, release, or compromise claims of his or her child."  Thus, the court of appeals concluded that "the release on behalf of [Trent] cannot be construed as valid."  <u>Woodman ex rel. Woodman</u>, 486 Mich. 228 (citation to court of appeals opinion omitted).  The Supreme Court agreed and affirmed the court of appeals.

Amica says that while <u>Woodman</u> considered the authority of a natural parent

over his or her child's rights, "the nature of the relationship and authority in that context is legally indistinguishable from that of a legal guardian and incapacitated person." (Doc. 67 at p. 10 n.4). The Court disagrees that Woodman is applicable to this case. While a guardian may share the same rights as a parent, the clear thrust of Woodman was whether a parent can waive rights of a minor child. Woodman had nothing to do with assignments of rights, much less the authority of a guardian to assign a right to PIP benefits. Woodman is therefore factually and legally distinguishable.

In short, the assignments are valid.

### D. Relation Back

Amica also argues that even if valid, the September 18, 2017 assignments are ineffective to convey claims for services incurred more than one year prior to the time that they were executed, i.e. September 2016. EDS says that the First Amended Complaint, filed on February 14, 2018, relates back to the original complaint filed in 2014 which sought payment for PIP benefits.

M.C.L. § 500.3145(1) provides in pertinent part that "the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." The "one-year-back rule" in M.C.L. § 500.3145(1) "is designed to limit the amount of benefits recoverable under the no-fault act to those losses occurring no more than one year before an action is brought." Joseph v. Auto Club Ins. Ass'n, 491 Mich. 200, 203 (2012).

In keeping with the changing legal landscape which has affected the progress of this case, the Michigan Court of Appeals recently considered this very issue in Jawad A. Shaw. M.D. P.C. v. State Farm, __ Mich. App. ___, 2018 WL 2121787 (Mich. Ct. App.

May 8, 2018). In Shah, the plaintiff/provider filed a complaint on February 24, 2017, seeking payment of PIP benefits on behalf of an insured. After Covenant was issued in May of 2017, the plaintiff obtained an assignment from the insured dated July 11, 2017. In moving to dismiss, the defendant argued that if the assignment was valid, then the plaintiff could only recover PIP benefits from one year back from the date of the assignment, or July 11, 2016. The court of appeals, 2-1, agreed. See Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co., 2018 WL 2121787, at *7–9 (Mich. Ct. App. May 8, 2018) (internal footnotes omitted).

At oral argument, counsel for EDS conceded that under Shah, EDS cannot recover because it is seeking benefits for services rendered more than one year back from the date of the assignments. Although State Farm has requested leave to appeal in Shah, and notwithstanding a strong dissent, the Court is constrained to apply Shah and conclude that the one-year back rule applies to limit EDS's right to recovery of PIP benefits from one year back from the date of the assignment, or September 18, 2016. Again, because EDS is seeking benefits which were incurred well before this date, the First Amended Complaint fails to state a viable claim for relief.

IV. Conclusion

For the reasons stated above, Amica's motion to dismiss is GRANTED. The First Amended Complaint is DISMISSED. In light of this decision, Amica's motion for summary judgment is DISMISSED AS MOOT. Amica shall advise the Court within twenty (20) days as to whether it wishes to pursue its counterclaim.

SO ORDERED.

CODA

This case stands as an example of the mischief created by the Michigan Supreme Court's decision in Covenant. Whether intended or anticipated, Covenant has resulted in a confusing, if not frustrating, legal landscape relative to a service provider's right to bring a direct action against an insurer to recover PIP benefits for services rendered to an insured. This is even more puzzling because less than two years before, the Michigan Supreme Court was presented with the very same issue. In Wyoming Chiropractic Health Clinic P.C. v. Auto-Owners Ins. Co., 308 Mich. App. 389 (2014), a panel of the Michigan Court of Appeals unanimously held that a service provider had standing to bring a direct action for PIP benefits against an insurer. Auto-Owners sought leave to appeal. On May 28, 2015, the Michigan Supreme Court unanimously denied leave to appeal in a standard order. Wyoming Chiropractic Health Clinic P.C. v. Auto-Owners Ins. Co., 497 Mich. 1029 (2015). One wonders what prompted the Michigan Supreme Court to have such a drastic change of heart.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: 7/24/2018
Detroit, Michigan