UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ELIZABETH DeLUCA, and
EDS CARE MANAGEMENT,
INC.,

    Plaintiffs/Counter-Defendants,                    Case No. 14-12175

vs.                                                                       HON. AVERN COHN

AMICA MUTUAL INSURANCE
COMPANY,

    Defendant/Counter-Plaintiff.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 83)

In a broad jurisprudential sense, equity means the power to do justice in a particular case by exercising discretion to mitigate the rigidity of strict legal rules. In this broad sense, equity means the power to adapt the relief to the circumstances of the particular case.[1]

---

    [1]Kevin C. Kennedy, Equitable Remedies and Principled Discretion: The Michigan Experience, 74 U. Det. Mercy L. Rev. 609 (1996-1997).

I. Introduction

This is a long suffering insurance dispute under Michigan's No-Fault Act. Plaintiffs/Counter-defendants, Elizabeth DeLuca (DeLuca) and EDS Care Management, LLC (EDS) (collectively, where appropriate, EDS) sued defendant/counter-plaintiff Amica Mutual Insurance Company (Amica) seeking payment of personal insurance protection (PIP) benefits from Amica. The PIP benefits were for the care of Stephanie Rudd (Rudd), the insured. While Amica paid some PIP benefits, it later ceased payments. Amica eventually filed a counterclaim (Doc. 4) and an amended counterclaim (Doc. 49) seeking recoupment of benefits. The amended counterclaim makes equitable claims for mistake of fact and unjust enrichment and is based on Amica's contention that EDS is not entitled to any benefits because it was not a "licensed adult foster care facility" which is required to obtain benefits under Michigan law.

After years of litigation and intervening changes in the law, only Amica's amended counterclaim remains in the case. Now before the Court is Amica's motion for summary judgment, seeking to recoup $268,555.00 in benefits it paid to EDS for services that Amica says were not "lawfully rendered." For the reasons that follow, the motion will be GRANTED IN PART AND DENIED IN PART. Although EDS was not entitled to the benefits, Amica is not entitled to recover against EDS.

II. Background

A. Factual Background

This dispute arose from an automobile accident that occurred on December 26, 2002 in which then 14 year old Stephanie Rudd (Rudd or the insured) suffered what

2

was later to be determined as a traumatic brain injury. The injury occurred when the airbag deployed and smashed into her face and skull. She required around the clock care. At the time of the accident, Rudd was insured under an automobile policy held with Amica, through her father.

In 2007, Rudd's mother sued Amica on behalf of Rudd in state court, seeking PIP benefits through April 18, 2008. The case settled for $200,000, and a Stipulation and Order for Dismissal was entered. In 2010, Rudd's mother filed a second lawsuit against Amica for PIP benefits that occurred after April 18, 2008. The parties went into arbitration on this claim, and Rudd was awarded $178, 593.96. This award covered the period of April 18, 2008 through October 26, 2011.

In 2012, DeLuca was appointed as Rudd's new legal guardian. DeLuca is both the guardian of Rudd and the owner of the facility that provided care for Rudd, EDS. EDS says that is has incurred reasonable expenses in caring for Rudd during her recovery from the accident, and sought payment for those expenses from Amica. Amica negotiated payment with EDS in the amount of $268,555.50 for the period of August 19, 2012 through July 31, 2013, and $41,815.88 with DeLuca for the period of February 15, 2012 through October 31, 2013. At some point, Amica stopped paying on EDS's claims.

B. Procedural History

DeLuca and EDS sued Amica in state court seeking to recover guardianship, conservatory, and trustee expenses, as well as expenses associated with residential and attendant care services supplied to Rudd from May 12, 2013 and beyond.

Amica removed the case to federal court based on diversity jurisdiction and filed

3

a counterclaim seeking to recoup the funds that it claims have been erroneously paid to EDS. In seeking this recoupment of funds, Amica maintained that Rudd did not in fact suffer a traumatic brain injury or that her injuries are not related to the accident. Amica's counterclaim alleged mistake of fact (Count I) and unjust enrichment (Count II) against EDS, and breach of fiduciary duty (Count III) against both DeLuca and EDS.

EDS filed a motion for summary judgement on Amica's counterclaims, contending that (1) Amica does not have standing and/or is not the real party in interest to pursue these claims since it has been reimbursed for any payments exceeding $300,000 by the Michigan Catastrophic Claims Association, (2) Amica's claims are barred by res judicata of prior litigation between Rudd and Amica. The Court denied the motion for summary judgment on Amica's counter claims. (Doc. 31).

Thereafter, the parties engaged in discovery during which Amica says it became aware that EDS is not a licensed care facility. Amica said that this information provided them with a plausible defense to non-payment. Amica then moved to amend their answer to add this as an affirmative defense and amend their counterclaim based on EDS not being a licensed adult foster care facility. (Doc. 43). The Court granted the motion. (Doc. 47).

Thereafter, Amica filed a motion for summary judgment based on its amended answer and counterclaim. (Doc. 55). Amica also filed a separate motion to dismiss based on the Michigan Supreme Court's decision in <u>Covenant Med. Ctr., Inc. v. State Farm</u>, 500 Mich. 191 (2017), holding that medical service providers, like EDS, have no cause of action to collect PIP benefits directly from no-fault insurers, like Amica. (Doc. 55).

The Court denied Amica's motion to dismiss as moot because the parties agreed to permit EDS to amend its complaint to include an assignment of rights count. The Court also held Amica's motion for summary judgment in abeyance pending the outcome of whether EDS obtained a valid assignment. (Doc. 65).

Amica filed a motion to dismiss EDS's First Amended Complaint (Doc. 67) and a motion for summary judgment (Doc. 52). The Court granted Amica's motion to dismiss and denied the summary judgment motion as moot. (Doc. 72). That left Amica's counterclaim. The Court gave Amica time in which to advise the Court whether it wanted to proceed on its amended counterclaim in light of the dismissal of EDS's complaint. Amica advised that it wanted to proceed.

During a subsequent status conference, the Court indicated it was going to dismiss Amica's counterclaim. The Court later entered an order dismissing the counterclaim and closing the case (Doc. 75).[2] Amica filed a motion for reconsideration, contending that the Court did not follow proper procedure before dismissing its counterclaim. The Court granted the motion, reopened the case, and reinstated Amica's amended counterclaim. (Doc. 80).

### III. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to

---

[2] The Court had hoped that Amica, after years of litigation which was largely resolved in its favor, would see the value of closure.

support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Rule 56 provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

## IV. Analysis

### A. Overview of Parties' Arguments

Amica says that EDS provided adult foster care services for Rudd and that under Michigan law, it is unlawful to maintain an adult foster care facility unless licensed by the state. Amica says that because EDS is not a licensed adult foster care facility, it is not entitled to be paid PIP benefits because the services it provided were not lawfully performed.

EDS says that it is not an adult foster care facility and therefore was not required

to be licensed. EDS further argues that even if it is an adult foster care facility, Amica cannot recover on its theories of mistake of fact or unjust enrichment.

B. Discussion

1. Whether EDS is an Adult Foster Care Facility Providing Adult Foster Care

a. The Statute

A threshold issue is whether EDS is in fact an "adult foster care facility" that provided "adult foster care services" to Rudd. Adult foster care is governed by the Adult Foster Care Facility Licensing Act, (AFCFLA), M.C.L. § 400.703(4). The statue defines an adult foster care facility as "an establishment that provides foster care to adults," with supervision, personal care, and protection in addition to room and board, for 24 hours a day, 5 or more days a week and for 2 or more consecutive weeks for compensation. M.C.L. § 400.703(4), §400.704(7). It includes "facilities and foster care family homes for adults who are aged, mentally ill, developmentally disabled, or physically disabled who require supervision on an ongoing basis but who do not require continuous nursing care." M.C.L. § 400.703(4). The terms "supervision," "personal care," and "protection" are all defined by the act. "Supervision" is defined as follows:

> (7) "Supervision" means guidance of a resident in the activities
> of daily living, including all of the following:
> (a) Reminding a resident to maintain his or her medication
> schedule, as directed by the resident's physician.
> (b) Reminding a resident of important activities to be carried out.
> (c) Assisting a resident in keeping appointments.
> (d) Being aware of a resident's general whereabouts even though
> the resident may travel independently about the community.

M.C.L. § 400.707(7).

"[P]ersonal care" consists of the following:

> "Personal care" means personal assistance provided by a licensee
> or an agent or employee of a licensee to a resident who requires
> assistance with dressing, personal hygiene, grooming, maintenance of
> a medication schedule as directed and supervised by the resident's
> physician, or the development of those personal and social skills
> required to live in the least restrictive environment.

M.C.L. § 400.706(1).

Lastly, "protection" is defined as follows:

> (4) "Protection", subject to section 26a(2), means the continual
> responsibility of the licensee to take reasonable action to insure[3] the
> health, safety, and well-being of a resident, including protection from
> physical harm, humiliation, intimidation, and social, moral, financial,
> and personal exploitation while on the premises, while under the
> supervision of the licensee or an agent or employee of the licensee, or
> when the resident's assessment plan states that the resident needs
> continuous supervision.

M.C.L. § 400.706(6), as amended by 1998 PA 442.

### b. EDS

Here, DeLuca organized the company and has identified herself as the corporate representative and owner. At deposition, DeLuca described EDS as a "care management company:"

> Q. What is a care management company?
> A. I provide attendant care to clients for whom I'm
> responsible for their care, supervision – care and supervision I guess.

(DeLuca Dep, p. 19, Appx. 23a.)

Shortly after her appointment as Rudd's guardian and conservator, DeLuca hired her company, EDS, to provide residential care for Rudd. That residential care included room and board, transportation services, and attendant care.

While EDS stated that it does not outright "own" real estate, it leased a single-family home at 21249 Bournemouth St. in Harper Woods. DeLuca explained that

8

EDS leased the property and utilized that property as housing for Rudd in conjunction with the care, services, and accommodations that EDS was providing to Rudd. Within days of EDS leasing the property, DeLuca moved Rudd into the home, and EDS began charging Rudd for room, board, and other services. EDS charged between $175.00 and $325.00 per day for residential services provided to Rudd.

Here, the evidence establishes that EDS provided "adult foster care" services for Rudd. First, EDS' invoices plainly establish that the services that it allegedly performed fall within the scope of "adult foster care" under Michigan law. EDS provides room and board to the patient in addition to 24 hours of general care, including local transportation, program coordination, behavioral support, and recreation. Likewise, EDS admitted that it provided "attendant care," "transportation," "housing," and "food" to Rudd. Additionally, the instructions prepared by EDS for Rudd's care identify the following duties for staff, among others: (1) "Insur[ing] [Rudd's] health and safety at all times"; (2) "Insist[ing] that [Rudd] maintains a clean and healthy environment, ie: cooking/cleaning/laundry"; (3) staying near Rudd at all times unless she is at school or with a family member; (4) administering Rudd's medication and ensuring that she swallows it; and (5) transporting Rudd, or accompanying her, to and from all of her appointments. Rudd's caregivers reported providing "Nutrition," "Schedule/Safety," "Behavior," "Medication Compliance," and "Hygiene" services on a daily basis while Rudd was receiving residential care. Administering Rudd's medication; reminding her of appointments; transporting or accompanying her to appointments and other destinations; reminding her of cleaning and other important chores; and staying near to her at all times unless she is at school or with a family member (i.e., being aware of her

whereabouts at all times) all fall within the definition of "supervision" under M.C.L. § 400.707(7). Furthermore, providing individualized help with hygiene and maintaining a medication schedule for Rudd constitutes "personal care" under M.C.L. § 400.706. Moreover, "[i]nsur[ing] [Rudd's] health and safety at all times" plainly constitutes "protection" as that term is defined under the statute. Therefore, there is no genuine issue of material fact that EDS is an "adult foster care facility" that provided "adult foster care services' for Rudd.

### 2. Whether EDS Should Be Licensed

Michigan law provides that adult foster care facilities must be licensed:

> (1) A person, partnership, corporation, association, or a department or agency of the state, county, city, or other political subdivision shall not establish or maintain an adult foster care facility unless licensed by the department.

M.C.L. § 400.713(1). Thus, there is no question that EDS, an adult foster care facility providing adult foster care services, was required to be licensed.

EDS makes several arguments in an attempt to circumvent the licensing requirement. None have merit. EDS argues, based on the Michigan Department of Licensing and Regulatory Affairs ("LARA") website, that (1) EDS does not provide all of the services that are necessary to trigger the adult foster care licensure requirement because it does not provide security or cleaning services, and that (2) "if one business provides one or two elements, and another unrelated business provides the other element(s), then the operation does not require licensure."

First, EDS' reliance on the webpage is misplaced, as the page simply does not constitute legal authority, and, significantly, the website directs the reader to the statutes and rules that actually define the "elements" summarized on the website. Further, EDS'

10

characterization of webpage is inaccurate. There is nothing on the webpage (1) referencing "security or cleaning services," or (2) suggesting that licensure is not required if different businesses provide separate "elements" of the care. Moreover, even if the website somehow constitutes legal authority that supports EDS' position, EDS has not proffered any documentary evidence in support of these "facts" that could preclude summary judgment in favor of Amica.

Next, EDS contends that it constitutes a "housing-with-services establishment" under M.C.L. § 333.26502, such that it is not required to be licensed. Section 333.26502 is within the Housing-with-Services Contract Act ("HWSCA"), which defines "housing-with-services establishment" and subsequently sets forth standards for contracts involving those entities and remedies for noncompliant contracts; it does not regulate licensure or legality of services. Section 7 of the HWSCA expressly states, "Nothing in this act limits a facility's responsibilities or obligations to be licensed under the adult foster care facility licensing act ["AFCLA"], . . . MCL 400.701 to 400.737 . . . ." M.C.L. § 333.26507. Thus, EDS' reliance on § 333.26502 is misplaced.

EDS also makes several references to LARA's (previously, the Department of Human Services' ("DHS")) authority to conduct investigations, suggesting that an investigation is necessary before an establishment is required to obtain a license in accordance with the AFCLA. Such a conclusion is contrary to the language of the AFCLA: "A person, partnership, corporation, association, or a department or agency of the state, county, city, or other political subdivision <u>shall not establish or maintain an adult foster care facility unless licensed by the department</u>." M.C.L. § 400.713(1) (emphasis added).

11

EDS also argues that DHS is the entity responsible for making a determination as to whether licensure is required for a particular facility. It argues that Amica is attempting to make this determination on behalf of the proper administrative body. Not so. In <u>Healing Place v. Allstate Ins. Co.</u>, 277 Mich. App. 51, (2007), the court of appeals engaged in the same inquiry with which this Court is faced in this case: determining whether a no-fault provider constitutes an adult foster care facility that is required to be licensed under the AFCLA for purposes of M.C.L. § 500.3157. Importantly, Amica is not asking the Court to issue or revoke a license, or perform any of the actions assigned to the department under M.C.L. § 400.713.

EDS also contends that "the licensing requirement of the statute does not apply to single family homes housing a single individual receiving attendant care services" because the applicable statute refers to "adults" plurally. See M.C.L. §400.703(4). In support of this argument, EDS relies on a recommendation prepared by a LARA "area manager" that "modified" a "previous recommendation" "to violation not established [sic] since foster care is only being provided to one adult at this time." Putting aside that the recommendation is not a binding interpretation of the statute, the administrative rules promulgated under the act, Mich. Admin. Code R. 400.2101 et seq.—which are legal authority—expressly contemplate that an "adult foster care small group home" could have only one resident and still be subject to licensure. See Mich. Admin. Code R. 400.141001 ("this part applies to all adult foster care small group homes that are licenses or proposed for 1 to 12 persons.").

### 3. Whether EDS Was Entitled to PIP Benefits

Having determined that EDS provided adult foster care services to Rudd and did

12

so without a license, the question becomes whether EDS was entitled to payment (PIP benefits) for the services it provided. Michigan law says no.

"A no-fault insurer is liable to pay no-fault benefits only for medical treatment that meets the requirements of the no-fault act . . . " Cherry v. State Farm Mut. Auto. Ins. Co., 195 Mich. App. 316, 318 (1992). PIP benefits are payable under the no-fault act as set forth in M.C.L. § 500.3107, which provides:

> A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, may charge a reasonable amount for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance.

In Healing Place at N Oakland Med. Ctr. v. Allstate Ins. Co., 277 Mich. App 51, 59 (2007) the Michigan Court of Appeals held that "the plain language of MCL 500.3157 requires that before compensation for providing reasonable and necessary services can be obtained, the provider of treatment, whether a natural person or an institution, must be licensed in order to be 'lawfully rendering treatment.' If both the individual and the institution were each required to be licensed and either was not, the 'lawfully render[ed]' requirement would be unsatisfied." The court of appeals further pointed out in Psychosocial Serv. Assoc., PC v. State Farm Mut. Auto Ins. Co., 279 Mich. App 334, 338 (2008) that while "services might be lawfully rendered even if a particular service is 'excluded' from the scope of the provider's licensed field: The purpose of the licensing statute is not to prohibit the doing of those acts that are excluded from the definition of [the field of practice], but to make it unlawful to do without a license those things that are within the definition" (internal quotation marks omitted). As another court put it, "[i]n

short, treatment is not lawfully rendered if the performance of that treatment requires a license and the provider acts without that license." Keys of Life v. Auto-Owners Ins. Co., 2016 WL 7493759 (Dec. 27, 2016).

Here, because the AFCFLA prohibits a person or corporation from maintaining an adult foster care facility unless licensed, and because neither the persons or corporation were licensed, the adult foster care was not lawfully rendered under the AFCFLA, and for purposes of section 3157 of the no-fault act. Thus, as in Keys of Life, where an unlicensed facility provided adult foster-care services, that facility did not lawfully render treatment under M.C.L. § 500.3157, and therefore its services were not compensable. As such, Amica is entitled to a finding that EDS was not entitled to PIP benefits for the treatment it provided to Rudd.

Having determined that EDS is an adult foster care facility that provided adult foster care services to Rudd, under Michigan No- Fault law, EDS was required to be licensed in order to receive benefits. It was not. The question then becomes whether Amica is entitled to relief on its counterclaims for mistake of fact and/or unjust enrichment.

### C. Whether Amica is Entitled to Relief

Michigan law provides "that money paid under a mistake of material facts may be recovered back" unless "the situation of the party receiving the money has been changed in consequence of the payment, and it would be inequitable to allow a recovery." Wilson v. Newman, 463 Mich. 435, 436 (2000) (quoting Walker v. Conant, 65 Mich. 194, 31 N.W. 786 (Mich.1887)). The money Amica paid to EDS was arguably made pursuant to a mistake of fact (Amica did not know that EDS was not licensed). So

14

EDS must repay those amounts unless it can demonstrate a change in consequence that would make repayment inequitable. See Wilson, 463 N.W.2d at 322 ("If the plaintiffs can demonstrate a change of position or detrimental reliance ... they may be entitled to retain all or part of the funds mistakenly paid by Allmerica."). See also Nationwide Mut. Fire Ins. Co. v. McDermott, No. 12-11863, 2014 WL 1464418, at *8 (E.D. Mich. Apr. 15, 2014), aff'd, 603 F. App'x 374 (6th Cir. 2015). Similarly, "[t]he elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." Bellevue Ventures, Inc. v. Morang-Kelly Investment, Inc., 302 Mich. App. 59, 64 (2013).

Here is the rub for Amica. Where does equity lie? There is some indication in the record that Amica was aware, through its representative Lynn Cach, that EDS did not possess an adult foster care license. The email correspondence on which EDS relies shows Cach discussing Rudd's "attendant care" and whether certain services were necessary. DeLuca's affidavit states that "EDS advised Lynn Cash that EDS was not an adult foster care facility, and as such had no license to operate as an adult foster care facility." Thus, it appears that over the many years the since Rudd's accident Amica never questioned whether Rudd's care constituted "adult foster care" or investigated whether EDS should have been licensed in order to provide such care.

Further, as the procedural history set forth above shows, both parties litigated EDS's right to benefits for years, in state and federal court. It was not until EDS filed suit here and Amica learned after much discovery that EDS was not licensed which provided it another basis on which to challenge EDS's right to payment.

15

As noted at the beginning of this decision, equity has been used to temper the "rigidity of strict legal rules." Here, the license requirement which has stripped EDS of its right to be paid PIP benefits is fairly considered a "strict legal rule." Allowing Amica to recover because under the circumstances turns the concept of equity on its head. Additionally, there is no dispute that EDS provided care to Rudd and incurred expenses relating to that care and detrimentally relied upon the years of Amica's payments in continuing to care for Rudd. It would be manifestly unjust under the unique circumstances of this case to require EDS to pay back PIP benefits it received for providing care to Rudd.

Finally, research reveals several cases where insurance companies were denied recoupment of benefits paid under a mistake of fact.[3] See Ass'n Life Ins. Co. v. Jenkins, 793 F. Supp. 161, 165 (M.D. Tenn. 1992) (denying recoupment of insurance benefits paid by mistake); Woolsey v. Nationwide Insurance, Co., 697 F.Supp. 1053, 1056–57 (W.D. Ark. 1988); Glover v. Metropolitan Life Insurance Co., 664 F.2d 1101 (8th Cir. 1981) ("The Missouri courts, when weighing the equities of a case, lay great emphasis on whether or not the payee has relied on retention of the payment received."); Myers v. Fidelity & Casualty Co. of New York, 759 F.2d 1542, 1548 (11th

---

[3]At oral argument, counsel for EDS furnished a copy of a recent unpublished decision of the Michigan Court of Appeals, Farmers Ins. Exchange v. St. Peter Med. Ctr. PC, No. 342821 (Mich. Ct. App. Sept. 10, 2019). In St. Peter, the court of appeals, as an alternative ground for affirming the trial court's decision in favor of the insurance company, noted that the insurance company was entitled to recoup benefits paid because the services at issue were not provided by a licensed physical therapist. The court of appeals also noted that the defendant had not argued or shown detrimental reliance. While St. Peter supports the Court's finding that EDS should not have been paid benefits, it does not alter the Court's conclusion that under the circumstances of this case, Amica is not entitled to recoupment.

Cir. 1985) (citing 13 S. Williston & W. Jaeger, A Treatise on the Law of Contracts § 1595 at 584 and 586 (1970)); Terra Nova Insurance Co. v. Associates Commercial Corp., 697 F.Supp. 1048, 1052 (E.D. Wisc. 1988) ("In reliance on the insurance settlement, [the defendant] changed its position to its detriment, and restitution is therefore inappropriate."). Here, principles of equity compel the conclusion that Amica is not entitled to recoup the benefits it paid to EDS.

V. Conclusion

Amica's motion is GRANTED IN PART AND DENIED IN PART. Amica has prevailed on its argument that EDS was not entitled to the PIP benefits and summary judgment is entered in favor of Amica as to liability. However, Amica is not entitled to recoup the PIP benefits wrongfully paid. As such, its motion for summary judgment seeking relief/damages is denied.

SO ORDERED.

S/Avern Cohn  
AVERN COHN  
UNITED STATES DISTRICT JUDGE

Dated: 9/19/2019  
      Detroit, Michigan